# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| | ) | |
| JOSUE RODRIGUEZ | ) | |
| | ) | 2:25-mj-0052 SCR |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

**FILED**
Mar 13, 2025
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___May 28, 2024 through January 15, 2025___ in the county of ___Solano___ in the ___Eastern___ District of ___California___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of Firearm/Ammunition |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

/s/ Dalton Ryken
*Complainant's signature*

Dalton Ryken, FBI TFO
*Printed name and title*

Sworn to me and signed via telephone.

Date: ___March 13, 2025___

*Judge's signature*

City and state: ___Sacramento, California___

Sean C. Riordan, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF APPLICATIONS UNDER RULE 41 FOR WARRANTS TO SEARCH AND SEIZE AND UNDER RULE 4 FOR A WARRANT TO ARREST**

# I.     INTRODUCTION

I, Dalton Ryken, being first duly sworn, hereby depose and state as follows:

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following people, premises, and property:

| Attachment | Target |
|---|---|
| A-1 | Josue RODRIGUEZ ("**RODRIGUEZ**") |
| A-2 | 117 Harvard Ave. Vallejo, CA 94589 ("**RODRIGUEZ'S Residence**") |
| A-3 | A 2010 Green Chrysler 300 CA# 8ASP602 (**RODRIGUEZ's Vehicle #1**) |
| A-4 | A 2008 Black Ford Crown Victoria CA# 8JNC223 (**RODRIGUEZ's Vehicle #2**) |

2.     These people and property are further described in Attachments A-1 through A-4, which are incorporated by reference herein.  The application seeks to search them for the things described in Attachment B-1 through B-4, which are incorporated by reference herein.  This affidavit also supports my application for an arrest warrant of RODRIGUEZ.

# II.     AGENT BACKGROUND

3.     Your affiant is Detective Dalton C. Ryken.  Your affiant is employed by the Solano County Sheriff's Office and has been since September of 2014.  Your affiant is currently assigned as a Detective and Task Force Officer (TFO) with the U.S. Federal Bureau of Investigation's (FBI) Solano County Violent Crime Task Force (SCVCTF) and is dually sworn as a state and federal law enforcement officer.

4.     Your affiant's responsibilities include investigations pertaining to violent offenders and violent organizations.  These investigations frequently involve the possession and possession for sale of controlled substances and firearms, robberies, and homicides.  Your affiant is currently assigned to a task force which includes members from various local agencies as well as federal agents.  Part of your affiant's assignment is to assist local Solano County law enforcement partners with investigations involving violent acts and violent crime.

5.      Your affiant attended a six-month basic police officer academy at the Napa Valley Police Academy in Napa, California.  This training included over 20 hours of specialized training in controlled substances, which also included, but was not limited to, controlled substance identification, packaging, distribution, influence, and characteristics of use.  Your affiant has attended over 200 hours of formal training pertaining to controlled substances and controlled substance investigations.  I have arrested or assisted with the arrest of persons for possession of cocaine, cocaine base, crystal methamphetamine, marijuana, heroin, fentanyl, and MDMA.  I have contacted no less than 500 people who have been arrested for possession of controlled substance(s), possession of controlled substances for sale, and/or firearms possession.

6.      Your affiant has participated in discussion and informal training sessions with more experienced controlled substance agents regarding the methods used by controlled substance manufactures, traffickers, and users.  I regularly read controlled substance related literature to remain abreast of contemporary topics.  Your affiant has spoken with individuals who have admitted possessing controlled substances for sale and/or possessing controlled substances for personal use.  These individuals have discussed various topics surrounding controlled substances to include: packaging, pricing, use, manufacturing, methods of concealing, money laundering, transportation, protection, and the overall lifestyle and culture surrounding the illicit business.

7.      Your affiant has testified as an expert in Solano County Superior Court for possession of methamphetamine, heroin, cocaine and fentanyl for sale. As a Detective and TFO, I have investigated cases involving possession of controlled substances and firearms for sale.  Through these investigations, I have participated in numerous controlled buys of firearms and controlled substances.

8.      Your affiant has participated in several investigations involving criminal gang activity within the county of Solano.  I regularly meet with various Deputies and Detectives from the Solano County Sheriff's Office, other members of the FBI task force, and counterparts from other law enforcement agencies to share information regarding gang activity.  I also regularly speak with gang members and their associates.  I have attended various formal and informal training pertaining to gang activity and regularly review intelligence reports from federal, state, and local agencies regarding gang trends and activities

9.      Your affiant was previously assigned to the Solano County Sheriff's Enforcement Team (SET).  SET's responsibility and mission is the apprehension of fugitives and checking on the compliance of individuals on supervised release.  During my time on SET, I conducted numerous controlled substance and firearms investigations.  I authored and served various search warrants pertaining to controlled substances, firearms, and stolen property.  I have worked with various bureaus within the Sheriff's Office, as well as various federal and state law enforcement agencies involving the investigations of various crimes.

10.     Previously, while employed as a Deputy Sheriff, your affiant was assigned to the Solano County Sheriff's Office Patrol Bureau for a total of four years.  During this time, your affiant made hundreds of arrests, conducted and participated in over a thousand criminal investigations relating to, but not limited to, homicides, assaults, domestic violence, robberies, burglaries, thefts, sexual assaults, stolen vehicles, possession of controlled substances for sale, firearms possession, gang participation, and missing persons.  These investigations consisted of interviewing witnesses, victims, and possible leads; locating and gathering evidence; apprehending criminal suspects and violators of the law; preparing and processing all necessary reports; and testifying as a witness in court.

11.     Prior to becoming a Deputy Sheriff, your affiant graduated from California State University Sacramento in 2012 with a Bachelor of Science Degree in Criminal Justice.  During my studies, I attended and completed courses relating to criminal investigations of the following: crimes against persons; crimes against property; narcotics; gangs; and firearms related offenses.

12.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

13.     Based on the facts set forth in this affidavit, there is probable cause to believe that Josue RODRIGUEZ has committed, is committing, or will commit violations of 18 U.S.C. § 922(a)(1)(A) - Unlawful Dealing in Firearms and 18 U.S.C. § 922(g)(1) -Felon in Possession of a Firearm and/or Ammunition. Collectively the violations described above will be referred to as the "TARGET OFFENSES". There is also probable cause to search the people and property described in Attachments

AFFIDAVIT                                    3

A-1 through A-4 for evidence and instrumentalities of these crimes further described in Attachments B-1 through B-4.

## II.    PROBABLE CAUSE

1.    The United States Government, and the FBI specifically, is investigating JOSUE RODRIGUEZ for suspected firearms trafficking in the Eastern District of California.

2.    Your affiant (TFO Dalton Ryken) maintains undercover (UC) social media account(s) throughout the course of his duties. Your affiant utilizes these accounts to monitor criminal activity taking place on Social Media throughout Solano County.  Your affiant has maintained various accounts for several years and has identified criminal targets via social media. During the course of his duty, your affiant began to follow the Instagram account "mr.exclusive_exoticflavors" on the Instagram social media platform. On May 9, 2023, your affiant observed the photo below posted to "mr.exclusive_exoticflavors" Instagram story.



*Photo captured on May 9, 2023.*

3.    Your affiant recognized the substance posted to the Instagram Story from training and prior methamphetamine investigations to be consistent with suspected methamphetamine. Additionally,

your affiant observed the photo had "Not for sale" posted with the photo. Your affiant recognized this activity as an attempt by drug and firearm traffickers to attempt to disguise their true intentions. Based on this, your affiant believed the post was made with the intention of offering methamphetamine for sale on the Instagram social media platform.

4.    After reviewing the account, your affiant was able to identify the owner of the account as Josue **RODRIGUEZ**. The following is a photo of **RODRIGUEZ** taken from a video on his Instagram page as well as his DL photo:

  

*Instagram post 05/11/21*          *DL photo 06/11/21*

5.    After observing the Instagram post of suspected methamphetamine, SA Nathan Cernat and your affiant tasked a Confidential Human Source (CHS)[1] to follow the account and monitor for further postings offering controlled substances and/or firearms for sale.

---

[1] The CHS started cooperating with the FBI in order to avoid prosecution from a state arrest. The CHS has since fulfilled his/her commitment to law enforcement and continued to cooperate with the FBI for monetary compensation. The CHS has requested the FBI's assistance with his/her immigration status in the U.S. should it be needed in the future. However, no assistance with the CHS' immigration status has been provided to the CHS thus far. The CHS has no criminal convictions. The CHS has been arrested, but not convicted, for the following offenses: possession of a concealed firearm in a vehicle. The CHS has been an informant for the FBI since August 2022 and has been proven to be a reliable CHS thus far. The CHS' reporting has been proven to be truthful and has been independently verified by FBI agents.

6.      On December 22, 2023 the CHS advised "mr.exclusive_exoticflavors" has posted firearms for sale via Instagram story. The CHS provided the following screenshots of the Instagram posts.

 

*Photos captured on December 22, 2023*

7.      Based on training and experience with firearms investigations, your affiant knows that manufacturers use various terminology for their firearms.  For example, different manufacturers will use various numbers and letters when referring to their model of handgun.  Based on the photo on the left, your affiant believed "G2C 9mm" is the model of a 9mm Taurus handgun. The photo in the middle "SCCY CPX-2" is another make and model of a 9mm handgun.  The photo on the right, "G17", likely refers to a Glock 17 which is a 9mm handgun.  Further, your affiant knows the term "tap in" to be slang for "ask me about" or "I have this for sale."  Your affiant believed the Ghost emoji references the fact the Glock 17 is a Glock style PMF (Privately Made Firearm) or "ghost gun." Based on these photos posted to **RODRIGUEZ**'s Instagram story, your affiant concluded **RODRIGUEZ** was likely involved in selling firearms without a license or through proper legal channels.  Additionally, a Records and Prosecution check of **RODRIGUEZ** returned that he has the following felony convictions prohibiting

him from firearm possession: a 2013 conviction for PC 459 (Burglary) and a 2016 conviction for PC 30305(A)(1) (Felon in Possession of Ammunition).

8.      During in or about May 2023, your affiant observed a link to a Telegram social media group chat being posted by another subject's Instagram Story. The CHS had been directed by SA Cernat and your affiant to enter the "Telegram" social media group chat. Telegram is an encrypted social media application in which users can communicate via group text. These groups are sometimes involved in the sale and/or trade of firearms, narcotics, child pornography, stolen vehicles, etc. Your affiant had observed links to a specific Telegram group on Instagram and SA Cernat and your affiant tasked the CHS with attempting to enter the Telegram group for the purpose of identifying firearms traffickers in Solano County. The CHS was successful in entering the Telegram group chat that was determined to have been created to facilitate the sale of firearms and stolen vehicles.  The CHS had also been previously tasked with attempting to contact **RODRIGUEZ** via Instagram regarding a possible firearm of drug transaction.  The CHS monitored **RODRIGUEZ**'s Instagram account(s), as well as the Telegram group chat.  The CHS observed the same or similar firearms being posted on the Telegram chat as well as on **RODRIGUEZ**'s Instagram stories.  Based on the similarity of the posts, it was suspected **RODRIGUEZ** was participating in the Telegram group chat.

9.      On May 10, 2024, the CHS observed the Telegram user "Kilo Gramz" post a "fully automatic AR-9 and a Mac 11" for sale on the Telegram group chat.  The CHS had previously observed the same firearms (or very similar) posted for sale on "mr.exclusive_exoticflavors" AKA **RODRIGUEZ**'s account.

10.     The CHS was tasked with direct messaging **RODRIGUEZ**'s Instagram account in attempt to arrange a purchase of one or more firearms.  On May 27, 2024, the CHS advised **RODRIGUEZ** agreed to sell an "AR-9 and Mac 11" for $2800 or $1400 a piece.

***Controlled buy of three firearms from RODRIGUEZ***

11.     On May 28, 2024, SCVCTF through the CHS conducted a controlled firearm buy from **RODRIGUEZ**. SA Nathan Cernat, ATF SA Daniel Bietz and your affiant met with CHS at a pre-determined meet location.  The CHS's person and vehicle were searched for contraband with negative results.  The CHS was given $5000 of ATF buy funds for a controlled purchase of firearm(s) from

**RODRIGUEZ**.  The CHS drove to the predetermined meet location, 42 Harbor Way, Vallejo.  CHP Investigator Eric Hulbert was set up with a view of 117 Harvard Ave. Vallejo (**RODRIGUEZ's Residence**). Investigator Hulbert observed **RODRIGUEZ** exit **RODRIGUEZ's Residence** with a black backpack.  **RODRIGUEZ** entered a green Chrysler 300 CA# 8ASP602 (**RODRIGUEZ's Vehicle #1**) and departed the driveway of the residence.  Simultaneously, **RODRIGUEZ** advised the CHS he was in route to 42 Harbor Way, in Vallejo.

12.     **RODRIGUEZ** arrived at 42 Harbor Way.  The CHS entered **RODRIGUEZ's Vehicle #1** and **RODRIGUEZ** provided CHS a short-barreled AR-15 style rifle as well as a Mac 11 style firearm. The rifle was originally advertised by **RODRIGUEZ** to be a AR-9 (9mm) but was in fact an AR-15 chambered in .223.  **RODRIGUEZ** advised the CHS that the firearms were fully automatic. **RODRIGUEZ** pulled out another loaded Mac 11 style firearm with a barrel shroud affixed to the barrel. **RODRIGUEZ** advised the CHS that the additional firearm cost $1400.  The CHS retrieved another $1400 of ATF buy funds from CHS vehicle.  In total, the CHS paid **RODRIGUEZ** $4200 for all three firearms.  **RODRIGUEZ** advised he had more firearms for sale and could acquire more for the CHS if needed.  **RODRIGUEZ** and the CHS departed the buy location.

13.     The CHS returned to the meet location under constant surveillance.  The CHS provided the three firearms to CHS handlers.  The CHS's vehicle and person were searched for unauthorized contraband with negative results.  The CHS returned the remaining $800 of ATF buy funds.  Below is a photo of the firearms recovered from the controlled purchase:



*Firearms recovered from 05/28/24 buy/walk*

14.     ATF SA Daniel Bietz later conducted an examination of both firearms. SA Bietz determined the AR-15 rifle was a short-barreled rifle. ATF Bietz test fired all the firearms purchased from **RODRIGUEZ**. The Mac 11 style firearm (without the barrel shroud) fired multiple times with a single press of the trigger. Based on the firearm repeatedly firing with a single press of the trigger, SA Bietz determined the Mac 11 tested presumptive positive for a machine gun. According to the ATF, RODRIGUEZ is not a federally licensed firearms dealer (FFL).

15.     On May 30, 2024, your affiant conducted a review of **RODRIGUEZ**'s Instagram profile "mr.exclusive_exoticflavors".  Your affiant observed several videos posted to the account.  The videos were co-posted by two accounts which included "mr.exclusive_exoticflavors" and

"mr.exclusiveexoticflavors707".  Based on the similarity in the account names, the content on the accounts and the fact multiple videos were co-posted, your affiant believed the account "mr.exclusiveexoticflavors707" belonged to **RODRIGUEZ**.  Additionally, the CHS advised the CHS had communicated with **RODRIGUEZ** on both accounts.

16.    Your affiant observed a video which was posted to the account "mr.exclusiveexoticflavors707" on February 29, 2024.  The video captured approximately nine firearms which were in a drawer.  Two of the firearms were Mac 11 style firearms and one appeared to resemble (or be the same firearm) the unmarked Mac 11 firearm purchased from **RODRIGUEZ** on May 29, 2024.  A screenshot from the video is below:



*Photo posted on February 29, 2024*

17.     The CHS was again tasked with direct messaging **RODRIGUEZ**'s Instagram account "mr.exclusive_exoticflavors" in attempt to arrange a purchase of one or more firearms.  On June 18, 2024, the CHS advised **RODRIGUEZ** agreed to sell a Glock 17 PMF with an installed fully automatic Glock switch and a drum magazine for $1400. Your affiant knows based on training and experience that a "Glock switch" is an aftermarket firearm component that is affixed to the rear of the slide of a Glock style firearm. The "switch" disables the semi-automatic function of the firearm and makes the firearm fully automatic turning the firearm a machine gun. Further, your affiant knows those in possession of these devices and/or those selling these devices are familiar its intended purpose. Firearm traffickers will advertise the switch and charge more for a firearm with a switch than a regular semi-automatic PMF. The term "switch" will also be referred to as a "fully" to imply fully automatic. **RODRIGUEZ** also agreed to sell a Springfield 1911 handgun with an extended magazine. **RODRIGUEZ** sent the CHS photos of both firearms as well as a video of the 1911 firearm. The CHS was able to capture a still shot of the Springfield 1911 firearm's serial number "N504937." The CHS sent the photos and videos to your affiant. Your affiant conducted a CLETS records check of the serial number. The records check returned the 1911 was reported stolen to the Butte County Sheriff's Office in 2020.

18.     **RODRIGUEZ** advised the CHS his friend had an AK-47 style firearm for sale for $2500. **RODRIGUEZ** advised he could sell the AK-47 firearm to the CHS as well. The CHS was instructed to arrange the purchase of the Glock PMF with the "switch" as well as the 1911 and arrange the purchase of the AK-47 for a date further in the future.

19.     On June 18, 2024, your affiant authored a federal search warrant (2:24-sw-0637) for six Instagram accounts. Two of the accounts included in the search warrant belonged to **RODRIGUEZ**, the remaining four belonged to additional participants of the Telegram group chat which were involved in firearm trafficking. The search warrant was signed by the Honorable US Magistrate Judge Allison Claire at 4:06 PM. Your affiant served Meta with the search warrant On June 19, 2024 at 9:00 AM.  The search warrant included following Instagram accounts belonging to **RODRIGUEZ**:

          i.   "MR.EXCLUSIVE_EXOTICFLAVORS"

          ii.   "MR.EXCLUSIVEEXOTICFLAVORS707"

*Controlled buy of two firearms from RODRIGUEZ*

20.    On June 20, 2024, SA Nathan Cernat, ATF SA Daniel Bietz and your affiant met with the CHS at a pre-determined meet location.  The CHS's person and vehicle were searched for contraband with negative results.  The CHS was given $5000 of ATF buy funds for a controlled purchase of the previously agreed upon firearms from **RODRIGUEZ**. The CHS drove to the predetermined meet location, 42 Harbor Way, Vallejo.  Prior to the buy, Solano County SO VICE Detective Preston Carole was set up with a view of **RODRIGUEZ's Residence**. Detective Carole observed **RODRIGUEZ's Vehicle #1** leave **RODRIGUEZ's Residence**.

21.    **RODRIGUEZ's Vehicle #1** arrived at 42 Harbor Way, driven by **RODRIGUEZ.** Shortly after, CHS arrived at the buy location. The CHS entered **RODRIGUEZ's Vehicle #1** and **RODRIGUEZ** provided CHS with both agreed upon firearms.  The CHS provided **RODRIGUEZ** $2800 of ATF buy funds ($1400 per firearm). **RODRIGUEZ** advised he had the AK style rifle at his residence would sell it to CHS when CHS desired.  **RODRIGUEZ** and the CHS departed the buy location.

22.    The CHS returned to the meet location under constant surveillance.  The CHS provided both firearms to CHS handlers.  The CHS's vehicle and person were searched for unauthorized contraband with negative results.  The CHS returned the remaining $2200 of ATF buy funds.  Below is a photo of the firearms recovered from the controlled purchase:


Firearms recovered during 06/20/24 buy/walk

23.    ATF Bietz test fired the firearms purchased from **RODRIGUEZ**. The Glock PMF fired multiple times with a single press of the trigger. Based on the firearm repeatedly firing with a single press of the trigger, SA Bietz determined the Glock PMF tested presumptive positive for a machine gun. Your affiant later obtained a copy of Butte County Sheriff's Office case #20-07102. Your affiant reviewed the report which documented that the 1911 firearm purchased from **RODRIGUEZ** had been stolen during a residential burglary in Butte County in 2020.

24.    Within the first week of July 2024, your affiant received search warrant returns from Meta for both of **RODRIGUEZ's** accounts. Your affiant reviewed the returns and observed multiple Instagram conversations consistent with **RODRIGUEZ** selling various firearms. Further, your affiant observed multiple messages where **RODRIGUEZ** answered to the moniker "Kilo" or identified himself by the moniker "Kilo." Your affiant believed this to provide further evidence the Telegram user "Kilo

Gramz" was **RODRIGUEZ**.

25.    The CHS and **RODRIGUEZ** had continuing communication via Instagram direct messaging regarding further firearm purchases. **RODRIGUEZ** agreed to sell CHS an AK-47 style firearm for $2100. **RODRIGUEZ** had sent the CHS a photo of the firearm.

### *Controlled buy of two firearms from RODRIGUEZ*

26.    On July 10, 2024, SA Nathan Cernat, ATF SA Daniel Bietz and your affiant met with CHS at a pre-determined meet location.  The CHS's person and vehicle were searched for contraband with negative results.  The CHS was given $5000 of ATF buy funds for a controlled purchase of the previously agreed upon firearm from **RODRIGUEZ**.  The CHS drove to the predetermined meet location, 42 Harbor Way, Vallejo.  Prior to the buy, Solano County SO VICE Detective Preston Carole was set up with a view of **RODRIGUEZ's Residence**. Detective Carole observed **RODRIGUEZ** exit **RODRIGUEZ's Residence** carrying a red bag. **RODRIGUEZ** entered **RODRIGUEZ's Vehicle #1** and left towards the Vallejo waterfront.

27.    CHS and **RODRIGUEZ** both arrived at 42 Harbor Way. **RODRIGUEZ** provided CHS with the agreed upon AK-47 firearm.  The CHS provided **RODRIGUEZ** $2100 of pre-recorded ATF buy funds. **RODRIGUEZ** showed CHS a loaded Smith and Wesson revolver. The revolver had not been talked about prior to the in-person meeting. CHS inquired to the price of the revolver. **RODRIGUEZ** agreed to sell the revolver to CHS for $800. CHS retrieved another $800 of ATF buy funds from the CHS vehicle and provided the money to **RODRIGUEZ**.

28.    The CHS returned to the meet location under constant surveillance.  The CHS provided both firearms to CHS handlers.  The CHS's vehicle and person were searched for unauthorized contraband with negative results.  The CHS returned the remaining $2100 of ATF buy funds.  Below is a photo of the firearms recovered from the controlled purchase:

1
2
3
4
5
6
7
8
9
10
11



Firearms recovered during 07/10/2024 buy/walk

12    29.    SA Bietz took custody of the firearms and later determined the AK-47 style firearm was a

13    short-barreled rifle.

14    30.    On January 9, 2025, your affiant conducted a search for **RODRIGUEZ**'s Instagram

15    accounts. Your affiant was unable to locate either of **RODRIGUEZ**'s accounts and suspected the

16    account may have been deleted by **RODRIGUEZ** or suspended by Instagram. SA Cernat tasked the

17    CHS to reach out to **RODRIGUEZ** via Telegram. The CHS messaged **RODRIGUEZ**'s Telegram

18    username "Kilo Gramz" and inquired if **RODRIGUEZ** had firearms for sale. **RODRIGUEZ** responded

19    to the CHS and advised he had an AR-15 style firearm, a Glock and several .22 caliber rifles for sale.

20    **RODRIGUEZ** provided his phone number (707-334-9511) to the CHS. The CHS spoke with

21    **RODRIGUEZ** via telephone. **RODRIGUEZ** agreed to meet the CHS at the waterfront. **RODRIGUEZ**

22    told the CHS his "cousin" was going to drive **RODRIGUEZ** since **RODRIGUEZ**'s vehicle was very

23    loud and he did not want to transport the firearms to the buy location in his vehicle.

24                    ***Controlled buy of three firearms from RODRIGUEZ***

25    31.    On January 15, 2025, SA Nathan Cernat, ATF SA Daniel Bietz and your affiant met with

26    CHS at a pre-determined meet location.  The CHS's person and vehicle were searched for contraband

27    with negative results.  The CHS was given $2250 of ATF buy funds for a controlled purchase of three

28    firearms from **RODRIGUEZ**.  The CHS drove to the predetermined meet location, 42 Harbor Way,

Vallejo.  Prior to the buy, Solano County SO Auto theft Detective Jared McDonald was set up with a view of **RODRIGUEZ's Residence**. Detective McDonald observed **RODRIGUEZ** arrive at the residence in a black Ford Crown Victoria CA# 8JNC223 (**RODRIGUEZ's Vehicle #2**). **RODRIGUEZ** exited the driver seat of **RODRIGUEZ's Vehicle #2** and a white female adult exited the passenger seat. **RODRIGUEZ** and the female and entered the **RODRIGUEZ's Residence**.

32.     Shortly after the CHS arrived at the buy location, athin Hispanic male (later identified as Ronald STANLEY) and **RODRIGUEZ** exited the front door of **RODRIGUEZ's Residence**. STANLEY entered the driver seat of silver Jeep Patriot CA# 7TYF334 and **RODRIGUEZ** entered the passenger seat. Surveillance units followed the Jeep to the buy location. The CHS met with **RODRIGUEZ** who was seated in the passenger seat of the Jeep. The CHS observed **RODRIGUEZ** had a .22 rifle tucked down his pant leg. The CHS could see the rifle sticking out of **RODRIGUEZ**'s pants. **RODRIGUEZ** told the CHS he had nothing to conceal the rifle in. THE CHS retrieved a blanket from the CHS vehicle and tucked the .22 rifle under it. The CHS handed **RODRIGUEZ** a black backpack from the CHS vehicle. **RODRIGUEZ** retrieved a black bag from the rear seat of the Jeep. **RODRIGUEZ** retrieved an AR-15 pistol and a Glock style PMF firearm from the black bag and placed both firearms in the backpack provided by the CHS. The CHS handed **RODRIGUEZ** the $2250 of ATF funds for all three firearms.

33.     The CHS returned to the meet location under constant surveillance.  The CHS provided the firearms to CHS handlers.  The CHS's vehicle and person were searched for unauthorized contraband with negative results.  The CHS used the entire $2250 of ATF buy funds during the controlled buy from **RODRIGUEZ**.  Below is a photo of the firearms recovered from the controlled purchase:



*FIREARMS RECOVERED FROM  01/15/25 BUY/WALK*

34.     On February 26, 2025, the CHS contacted **RODRIGUEZ** at cell phone number 707-334-9511 and inquired if **RODRIGUEZ** had any firearms for sale. **RODRIGUEZ** confirmed that he had firearms for sale and told the CHS that he would send the CHS a video of the firearms when he got home. Later the same day, **RODRIGUEZ** sent the CHS pictures of two AR-15 style pistols and one Glock 32 handgun with a drum magazine. **RODRIGUEZ** told the CHS the price for the AR-15 pistols was $1000 each and the price for the Glock 32 handgun was $1500 without the drum magazine or $1700 with the drum magazine. **RODRIGUEZ** told the CHS that he was anticipating getting two revolvers as well.

35.     On March 6, 2025, your affiant conduced a spot check surveillance of **RODRIGUEZ's Residence.** TFO Ryken observed **RODRIGUEZ's Vehicle #1** parked in the driveway and **RODRIGUEZ's Vehicle #2** parked on the street**.**

36.     Based on the overall investigation, your affiant concludes probable cause exists that **RODRIGUEZ** is utilizing various social media applications including Instagram and Telegram to sell and profit from the illicit sale of firearms.

*Training and Experience Regarding Drug/Firearm Trafficking and Drug/Firearms*

*Traffickers*

37.     As a result of my training and experience, I know that the traffickers who deal in controlled substances and firearms, or those that assist in that venture, maintain and tend to retain accounts or records of those transactions.  Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of the co-conspirators.  These records may be kept on paper or contained in memory calculators, cell phones, tablets and/or computers.  It is also my experience that these traffickers tend to keep these accounts and records in their residences and in the areas under their control.  It is my training and experience that in the case of firearm trafficking, evidence is likely to be found where the dealers live.  It is also my training and experience that where criminal activity is long term or on-going, equipment or records of the crime will be kept for some period of time.

38.     I have learned that large-scale drug and firearms traffickers often have on hand large amounts of United States currency in order to maintain and finance their ongoing business.  It has been my experience that drug and firearm traffickers often keep large sums of currency, caches of drugs or weapons, financial instruments, precious metals, jewelry, automobiles, and other items of value and/or proceeds of firearm transactions related to obtaining, transferring, secreting or spending large sums of money acquired from engaging in in the acquisition and distribution of controlled substances in their residence or in the areas under their control.

39.     In my experience, drug and firearm traffickers commonly have in their possession, that is on their person, at their residence, and their vehicles, and in the areas under their control, firearms, included but not limited to handguns, pistols, revolvers, shotguns, rifles, machine guns, and other weapons.  Such firearms are used by criminals to protect their illicit trafficking operations, and themselves against law enforcement and others because the illicit drug and firearms trade is an inherently dangerous illegal activity involving large amounts of valuable contraband and drug proceeds.

40.     In my experience, traffickers commonly have in their possession, that is on their person, at their residence, and in their vehicles, and in the areas under their control and which they have free and ready access to drugs and firearms, which they intend to distribute.  It is my experience that these

traffickers commonly utilize these areas (vehicles, residences, properties, etc.) as locations to conceal their narcotics from law enforcement.

41.    In my experience, traffickers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product.  Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

42.    In my experience, traffickers often maintain in their possession and at their residence fictitious identification, including but not limited to, driver licenses, employment cards, insurance cards, social security cards, certificates of birth and passports which are obtained by the traffickers and utilized in an effort to prevent law enforcement identification of the traffickers and their drug trafficking activities.

43.    In my experience, drug and firearm traffickers often utilize vehicles in which to transport and distribute controlled substances in facilitation of their trafficking activities.  It has also been my experience that traffickers will also utilize the vehicles as locations in which to store controlled substances and firearms prior to distribution.  Through my training and experience, I have observed that traffickers will often utilize vehicles registered in the names of individuals other than themselves in an effort to avoid detection by law enforcement.

44.    In addition, drug and gun traffickers often tend to attempt to legitimize their assets by establishing domestic and foreign businesses, by creating shell corporations, by utilizing foreign bank haven countries and attorneys specializing in drafting and establishing such entities employed to "launder" proceeds derived from the distribution of controlled substances.

45.    Individuals involved in the distribution of guns and drugs often make, or cause to be made, pictures videos, movies, compact discs, or other such items which are or contain photographic or digital images in order to memorialize their narcotics distribution, use, possession, or any other activities surrounding their trafficking activities, and that such items often identify co-conspirators in their trafficking activities.

46.    It has been my experience in the past, and particularly in this case, that when suspects use mobile phones to communicate with cooperating individuals or undercover agents to set up their illegal transactions, records relating to these activities will be found stored in the cellular telephone.

47.     I know that traffickers use mobile phones to communicate with one another, either by voice or text message.  Mobile phones preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the phone numbers of other traffickers and the dates and times that they and/or the mobile phone user dialed one another's telephones.  Mobile phones also contain in their memory a telephone book.  This allows the user to store telephone numbers and other contact information; the information stored in a phone used by a trafficker is evidence of the association of the trafficker, some of which is related to his or her illegal business.  Mobile phones also have a voice mail function that allows caller to leave a message when the user does not answer.  Traffickers sometimes leave voice messages for each other, and this is evidence both of their mutual association and possibly their joint criminal activity.  Mobile phones can also contain other user-entered data files such as to-do lists, which can provide evidence of crime when used by a trafficker.  Mobile phones can also contain photographic data files, which can be evidence of criminal activity when the user was a trafficker who took pictures of evidence of crime.

48.     As described in the Attachments A-1 through A-4, this affidavit seeks permission to search and seize things that are related to the drug/firearms-trafficking activities of Josue RODRIGUEZ and/or his co-conspirators and accomplices, in whatever form such things are stored.  Based on my training and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensic tools. Similarly, things that have been viewed via the Internet, are typically stored for some period of time on the device.  This information can sometimes be recovered with forensic tools.

49.     It is my opinion, based on my training and experience, and the training and experience of other law enforcement investigators to whom I have spoken, that the items listed in the respective Attachment B are items most often associated with the distribution of controlled substances and firearms as well as the proceeds from such illegal operations.

50.     Individuals involved in drug trafficking also often maintain paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances. Individuals involved in firearm trafficking also maintain ammunition, firearm parts, firearm accessories, holsters, etc.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

51.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

52.     Probable cause.  I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

53.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

54.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

55.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

56.     Similarly, files that have been viewed via the Internet are sometimes automatically

downloaded into a temporary Internet directory or "cache."

57.    Forensic evidence.  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

58.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

59.    As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described

herein, computers typically contains information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

60.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

61.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

62.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

63.     Necessity of seizing or copying entire computers or storage media.  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant.  In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

64.     The time required for an examination.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.  As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

65.     Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

66.     Variety of forms of electronic media.  Records sought under this warrant could be stored

1  in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

2      67.     Nature of examination.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the

3  warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that

4  reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a

5  later review of the media or information consistent with the warrant.  The later review may require

6  techniques, including but not limited to computer-assisted scans of the entire medium, that might expose

7  many parts of a hard drive to human inspection in order to determine whether it is evidence described by

8  the warrant.

9  **CONCLUSION**

10      68.     I submit that this affidavit supports probable cause for a warrant to search the PREMISES

11  described in each respective Attachment A and seize the items described in each respective Attachment

12  B.

13  **REQUEST FOR SEALING**

14      69.     It is respectfully requested that this Court issue an order sealing, until further order of the

15  Court, all papers submitted in support of this application, including the application and search warrant.  I

16  believe that sealing this document is necessary because the items and information to be seized are

17  relevant to an ongoing investigation into the criminal organizations as not all of the targets of this

18  investigation will be searched at this time.  Based upon my training and experience, I have learned that

19  online criminals actively search for criminal affidavits and search warrants via the Internet, and

20  disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

through the carding forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

/s/ Dalton Ryken
_____

Dalton Ryken
Task Force Officer
FBI

Subscribed and sworn to me via telephone on:    March 13, 2025
_____

The Honorable Sean C. Riordan
UNITED STATES MAGISTRATE JUDGE

/s/ Heiko P. Coppola
_____

Approved as to form by AUSA HEIKO P. COPPOLA

**United States v. Josue RODRIGUEZ**
**Penalties for Criminal Complaint**

## COUNT 1:

VIOLATION:        18 U.S.C. § 922(g)(1) – Felon in Possession of Firearm

PENALTIES:        A maximum of up to 15 years in prison; or
                  Fine of up to $250,000 or both fine and imprisonment
                  Supervised release of at least 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)